## The Denver and Rio Grande Railroad Company
## v. Robinson.

1. RAILROADS—NEGLIGENCE.

The mere fact that an animal was killed by a locomotive of the defendant company is not sufficient to warrant a recovery. The damage must have occurred through its negligence, which must be made to appear by proof.

2. INSTRUCTIONS.

An instruction which announces a naked legal proposition is objectionable.

3. SAME.

An instruction which assumes that there is evidence from which the jury might find a fact where there is no evidence on the subject is erroneous.

*Appeal from the County Court of El Paso County.*

Messrs. WOLCOTT & VAILE and Mr. WILLIAM W. FIELD, for appellant.

Messrs. PATRICK & ESSEX, for appellee.

THOMSON, J., delivered the opinion of the court.

This action was brought by R. G. Robinson against The Denver and Rio Grande Railroad Company, to recover the value of a mule killed by a locomotive engine, managed and operated by the defendant. The plaintiff had judgment, from which the defendant appeals.

The plaintiff was the lessee in possession of a ranch or farm in El Paso county, about two hundred acres of which was a pasture field surrounded by a fence. The track of the railroad company ran through this field. Its right of way through the pasture was not fenced; but from the point where the track left the field, going east, there was a fence on each side of it for a distance of about eight hundred feet to a bridge,

across which the track was laid.   Where the two fences commenced they were about one hundred and eighty feet apart; but they converged, until, at the bridge, the interval was only about one hundred feet.   There was thus inclosed a piece of ground shaped like a funnel.   This inclosure contained two side tracks besides the main track.   At the narrow end, the fences joined upon the bridge.   At the other end, where the track left the field, there had at one time been cattle guards; but they were removed before the plaintiff leased the ranch, and the opening from the plaintiff's pasture into the funnel shaped inclosure afterwards remained unobstructed.

The plaintiff testified that he turned two mules, of which he was the owner, into his pasture field, in the evening, between sun down and dark.   During the night one of the mules was killed.   He found it the next morning on the farther side of the bridge, torn to pieces.   He found blood, hair and pieces of flesh upon the bridge, and mule tracks along the railroad track, going toward the bridge and close to it.   The other testimony for the plaintiff was, as far as it went, simply corroborative of his own.   When the plaintiff rested the defendant asked a judgment of nonsuit, which was denied.

We are unable to find any evidence in behalf of the plaintiff, at the close of his case, which would authorize a verdict in his favor.   Assuming that, from the circumstances in evidence, it might be inferred that the animal was killed by a locomotive of the defendant, this is the utmost extent to which the evidence goes.   But this is not enough.   The fact alone that the defendant killed the mule fixes no liability upon it.   The damage must have occurred through its negligence, or that of persons in its employ.   There is no presumption of negligence; its existence must appear by proof; and until it does so appear, a party, whose case is based upon it, is without a cause of action.   The plaintiff had no witness to the fact of killing the mule, and therefore did not produce evidence upon which negligence in the persons operating the engine

could be predicated. Counsel do not claim that there was any proof of this kind, but find negligence in the character and condition of the inclosure. The argument is substantially as follows : The company was under no legal obligation to fence its right of way, but if it elected to do so, it must not by its act increase the danger to animals straying upon its grounds. After it had made the funnel shaped inclosure, it was its duty to maintain cattle guards on the west end ; and the removal of the guards originally there, leaving the fences still standing, and the entrance to the inclosure open, was negligence for which it is answerable in this action. If this argument did not assume what it was necessary to prove, we should admit its force. There was at that time no law requiring the company to fence its right of way ; but if it was responsible for the maintenance of this inclosure, it was its duty to take proper precautions to prevent cattle from going within it. Left in the condition it was in, it was, as counsel characterizes it, a trap, from which cattle within it, when a train entered it from the west, had little chance of escape. An animal upon the track, frightened by an approaching train, and seeing a fence on either side, would naturally seek an outlet over the bridge, where it would be caught in the open spaces between the ties, and must inevitably be run upon if the train proceeded. In this state an owner of cattle may permit them to run at large ; and surely, if a railroad company sees fit, unnecessarily, to fence its right of way, and in doing this makes an inclosure so contrived that there is easy access to it by cattle at one point, and no escape at any other, it cannot be acquitted of blame when an accident occurs as the direct consequence of its act.

But there is no evidence that the defendant constructed, or maintained, or had any control of, the fences in question. Some of the witnesses, in speaking of them, used the expression, " railroad fence ; " and counsel seem to think that an inference ought therefore to be indulged in, that the fences belonged to the railroad company. But the expression had no special meaning beyond the identification of the particu-

lar fence of which the witness was speaking. The plaintiff
used the term to distinguish the fence he referred to from
the "pasture fence;" and there is nothing to indicate that
any witness intended to be understood as expressing an opin-
ion concerning the ownership of the "railroad fence." But
it is not very material what the witnesses may have intended.
An expression of that kind is not the statement of a fact.
No witness stated when, or by whom, the fences were built,
who kept them in repair, or who exercised control over them.
From the evidence, it is just as probable that they were built
by the owner of the land for his own convenience, as that
they were built by the railroad company. Indeed, from a
statement of plaintiff, it might be inferred that they were not
constructed by the company. He stated that the width of
the right of way was about one hundred feet. If he stated
the width correctly, then, except where the fences joined
upon the bridge, they must have been off the right of way,
upon ground to which the company had no title, upon which
it had no right to place a fence, and from which it had no
right to remove one. There is an equal absence of evidence
concerning the cattle guards. By whom they were con-
structed, or removed, we have no intimation. The railroad
company must, in some way, appear to be responsible for
the existence of the fences, before it can be held responsible
for the consequences of their existence. The defendant was
entitled to the nonsuit asked; and, if it had quit the case at
that point, there would be little trouble in disposing of it.

But the defendant waived the error by the defense which
it made. It placed upon the witness stand John R. Shanley,
who testified that he was the engineer in charge of the engine
that killed the plaintiff's mule. The accident occurred about
one o'clock in the morning. It was very dark. There were
about twenty loaded cars attached to the engine. The mule
was on the bridge. Its belly was on the ties, and it looked as
though its legs were down between them. The train was
going at the rate of eighteen or twenty miles an hour. The
grade was about level. There was a good headlight upon

the engine. It was the duty of the witness to keep his eyes upon the track ahead of him, and watch it closely all the time. He could see by his headlight for the distance of about two telegraph poles. He thought the poles were about two hundred feet apart. He did not see the mule until he was within about fifty feet of it. He did all he could to stop the train by the time he reached the animal, and, as soon as he struck it, he did bring it to a full stop. He was asked the following question : " State what distance then, it would have been possible to stop that train in, loaded as it was, and on that grade ? " to which he answered, "You might have stopped it within five or six hundred feet." We think the testimony of this witness warranted the submission of the question of negligence to the jury. They had the right to find that on that night, with the headlight which he had, he could see the track ahead of him for a distance of four hundred feet, and that he ought to have seen this mule at that distance ; that he ran the train at full speed for a distance of three hundred and fifty feet from the time when he ought to have observed the mule to the time when he did observe it ; and they had the right also to infer that if he had seen the mule when he ought to have seen it, he could have stopped the train before striking it. The question we have quoted was evidently asked with a view to ascertaining within what distance that train could possibly have been brought to a halt at that place. He did not answer the question. He did not give the limits within which it was possible to stop the train. He only said that it might have been stopped within five or six hundred feet. The jury could therefore infer that it might have been stopped within five hundred feet ; but how far within five hundred feet? This was left indefinite. The distance at which the mule could have been seen was within five hundred feet. Furthermore, if, with only fifty feet of effort, the engineer was able to bring the train to a complete halt immediately upon coming in contact with the animal, might he not by the exercise of equal diligence, while running the preceding three hundred and fifty feet, have stopped

it before reaching that point? All these matters were proper subjects of consideration by the jury in determining whether there was negligence or not; and if the question had been submitted to them unembarrassed by assumed conditions, foreign to the case as made by the evidence, their verdict would be permitted to stand.

Defendant's counsel construe Shanley's testimony upon the subject of stopping the train as meaning that the train could not be stopped in less than six hundred feet. This was not what the witness said; but, if such was the case, with the train under full headway until the mule could be seen, it was of course impossible to avoid the disaster. The mule could not be seen until it was too late to avert a collision. If we concede to counsel the existence of this state of fact, there is a deduction to be made from it which is not favorable to the defendant. Here was a place of known danger. What happened upon this occasion was liable to occur at any time. If, when an object upon the bridge could be first seen, it would be too late to avoid striking it, common prudence would require a sufficient preceding diminution of the speed of the train to enable the engineer to stop it in time, if, upon coming in sight of the locality, it should be found that the necessity existed for so doing.

We should affirm this judgment were it not for one instruction which the court gave the jury. This is as follows:

" You are instructed that in this state the owners of animals may permit them to run at large and need not keep them within any inclosure; and you are further instructed that the railroad company is under no obligation to fence its track, but if it do fence its track in whole or in part, it must exercise care in so doing, to such an extent as not to increase the hazard to live stock, which may be pasturing and ranging upon lands near by, and adjacent to, its track."

This instruction announces a naked legal proposition, and is objectionable for that reason; but it is more objectionable for the implication which it conveys. To say that it impliedly assumes that the railroad company built these fences,

would not do violence to its language; but, giving it the most liberal construction it will bear, it is based upon an assumption that there was evidence from which the jury might find that such was the fact. There was no evidence whatever on the subject. The case to which the legal proposition embraced in the instruction might apply was purely hypothetical. If the jury considered the instruction at all, it must have created in their minds a false impression in regard to the facts, or the law to be applied to the facts. It would necessarily lead them to believe that, in the opinion of the court, there was proof of some kind that the company made the fences; or that, from some fact or facts in evidence, they were authorized to presume that it did so. The instruction could have no effect, except to confuse and mislead the jury; and for the error in giving it, the judgment must be reversed.

*Reversed.*